IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

                **Plaintiff,**

v.                                 **CRIMINAL NO. 07-294 LH**

**MARTIN ENCINIAS, and**
**LUIS ALFONSO ZAMORA-PEREZ.**

                **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Joint Motion to Suppress (Docket No. 45).    Defendants contend that drugs seized during a traffic stop were illegally obtained.  The Court, having considered the briefs and arguments of the parties and relevant caselaw, as well as evidence presented at a hearing on October 11, 2007, concludes that this motion is not well taken and shall be **denied.**

## I.  Procedural Standards

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of Rule 12(d).  The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's

1

confession or consent to search.  *See United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982).

In deciding such preliminary questions, the other rules of evidence, except those with respect to

privileges, do not bind the Court.   *See* FED.R.EVID. 1101(d)(1).   Thus, the Court may consider

hearsay in ruling on a motion to suppress.  *See United States v. Merritt*, 695 F.2d at 1269.

At a suppression hearing, the judge is to determine the credibility of the witnesses and the

weight to be given to the evidence, together with the inferences, deductions, and conclusions to be

drawn from the evidence.  *United States v. Werking*, 915 F.2d 1404, 1406 (10th Cir. 1990).


## II.  Legal Standards

A traffic stop is a seizure that is treated as an investigative detention.  *United States v.

Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995).  An investigative detention is an exception to the

probable cause requirement.  *See Terry v. Ohio*, 392 U.S. 1, 26 (1968).  To determine whether an

investigative detention is reasonable, the court must determine (1)  whether the officer's action was

justified at its inception, and (2) whether it was reasonably related in scope to the circumstances that

justified the interference in the first place.  *Botero-Ospina*, 71 F.3d at 786.

The New Mexico statute at issue, N.M.S.A. § 66-7-318A, states:

> The driver of a motor vehicle shall not follow another vehicle more closely than is
> reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon
> and the condition of the highway.

An investigative detention is justified at its inception only if the officer is aware of specific

articulable facts, together with rational inferences from those facts, that reasonably warrant

suspicion that the detained individual may be engaged in criminal activity.  *See Terry*, 392 U.S. at

20-21.  This Court must examine the events that occurred leading up to the stop, to determine

whether the "historical facts, viewed from the standpoint of an objectively reasonable police officer,

amount to reasonable suspicion or probable cause."  *Ornelas v. United States*, 517 U.S. 690, 696 (1996), *quoted in United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

An investigative detention may only last as long as necessary to effectuate the purpose of the stop.  *See United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003).  The scope of the detention must be carefully tailored to its underlying justification.  *Id*.  Generally, an officer must allow the driver to depart, once the initial justification for the traffic stop has concluded.  *Id*.  During a routine traffic stop, an officer may ask questions, examine documentation, and run computer verifications as necessary to determine whether the driver has a valid license and is entitled to operate the vehicle.  *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997).  The officer may detain the driver and the vehicle as long as reasonably necessary to make these determinations.  *Id*.

A stop generally ends when the officer returns the driver's license, registration, and insurance information.  *United States v. Werking*, 915 F.2d at 1408.  At this point, questioning must cease and the driver must be free to go.  *Id*.  This general rule, however, is subject to an important exception.  Additional questioning unrelated to the traffic stop is permissible if the detention becomes a "consensual encounter."  *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998).  "A consensual encounter is simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official."  *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999)(*quotation omitted*).  A seizure, by contrast, occurs when an individual has an objective reason to believe that he is not free to terminate his conversation with the officer and proceed on his way.  *Id*.

Whether an individual consents to further questioning is based on the totality of the circumstances.  This determination ultimately calls for the "refined judgment" of the trial court.

3

*Werking*, 915 F.2d at 1408 (*citation omitted*).  An encounter is consensual when a reasonable person would believe he was free to leave or disregard the officer's request for information.  *Id.*  A consensual encounter is a voluntary exchange between the officer and the citizen in which the officer may ask non-coercive questions.  *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000).  A police officer does not have to inform the citizen that s/he is free to disregard any further questioning for the encounter to be consensual.  *Id*.

## III.  Findings of Fact

Before and after the hearing, the Court reviewed an audio/video tape of the traffic stop, which was recorded by New Mexico State Patrolman, Officer Ramos, who effectuated the traffic stop.  This recording was supplied to the Court prior to the hearing by Defendants, and admitted as Exhibit No. 8 at the October 11, 2007 hearing.

Defendants have repeatedly implored the Court to disbelieve the testimony of the officers, particularly that of Officer Ramos.  They urge the Court to consider  prior testimony of this officer in other hearings before other judges, testimony that they characterize as being untruthful.  The Court concludes that such an exercise would be an unnecessary "trial within a trial," is irrelevant propensity-type evidence, and that this request invades the providence of this Court to independently evaluate the veracity of the witnesses who testify before it.

In making these factual findings, the Court has carefully considered the credibility of the four witnesses who testified at the suppression hearing and has carefully considered the weight to be given to all evidence, together with the inferences, deductions, and conclusions to be drawn from it. The Court has reviewed the audio/video tape and accepts the following facts as being true, relevant and material to these proceedings:

4

### A.  Testimony of Officer Casaus

Defendants were in a Ford Expedition ("the SUV""") headed eastbound on Interstate 40 ("I-40"), and were pulled over by two New Mexico State Police officers on January 26, 2007. Defendant Encinias was driving and Defendant Zamora-Perez was the only passenger.  Officer Nick Ramos was the primary, arresting officer, and Officer Ramon Casaus was the secondary officer. Officer Casaus observed the SUV following closely behind a white car, only about a car length behind the white car, which he considered an unsafe act and a traffic violation.  He observed that when the police vehicle pulled along side the SUV, it slowed down, from approximately 75 miles per hour, to 55 or even 45, miles per hour.  Officer Ramos subsequently positioned the police vehicle behind the SUV, engaged his emergency lights and initiated a traffic stop of  it.

At the time that Officer Ramos engaged the emergency lights of his vehicle to effectuate the traffic stop, an audio/video camera was turned on.  Specifically, this equipment was engaged once the police vehicle pulled in the lane directly behind the SUV.  By this time, the white car had disappeared from view and was not filmed by the camera.

Once both vehicles were on the shoulder of the road, Officer Ramos approached the passenger side of the SUV and Officer Casaus stood at the right front quarter panel of the police vehicle.  Officer Casaus smelled a strong odor of air freshener at that location.  Officer Ramos asked the driver to exit the vehicle.  Mr. Encinias walked back to where Officer Casaus was located.  Mr. Encinas said he was enroute from Phoenix to Colorado Springs.  Officer Casaus understood that the owner of the SUV was not in the vehicle.  Mr. Encinias told the two officers that he intended to visit his cousin, Marco, in Colorado Springs.  Later he told Officer Casaus that he was going to Colorado Springs to visit a sick, diabetic aunt.

5

Officer Ramos issued a traffic citation (for following too closely) to Mr. Encinias and returned his documents to him.  At that time, Officer Ramos said something to the effect of, "You're free to go, but do you mind if I ask you some more questions."  Mr. Encinias responded something to the effect of, "Sure, that's fine."

### B.  Testimony of Officer Ramos

Officer Ramos testified consistently with the testimony of Officer Casaus regarding the events leading up to the traffic stop.  According to Officer Ramos, he observed the SUV less than one vehicle length behind the white car, which he considered an unsafe act and a traffic violation. He stated that he concluded that this was a traffic violation based upon state statutes, and pursuant to National Traffic Highway Safety Administration standards. He did not specify what these standards are, although he noted that following too closely is one of the main reasons there are so many accidents –  that people drive too closely to each other, and there is no time for reaction.

When Officer Ramos exited the police vehicle and was at the rear corner of the SUV,  he detected a strong odor of air freshener.  Looking inside the SUV, he was able to view several air fresheners positioned along each door of the vehicle.  Five air fresheners were recovered from the vehicle.  When the driver handed his driver's license, proof of insurance, and registration to him, Officer Ramos noticed that Mr. Encinias's hands were significantly shaking.  Mr. Encinias told Officer Ramos that a friend, Adrian Rivera, had lent the vehicle to him.  Officer Ramos checked the vehicle identification number and temporary vehicle tag, and ascertained that the vehicle was not stolen.  He also requested the dispatcher to check the driver's license of Mr. Encinias.  Everything checked out satisfactorily.

Officer Ramos asked the passenger, Mr. Zamora-Perez, some questions, who told him that

he was coming from Phoenix and going to Colorado to visit a friend, Israel Conseca.

Officer Ramos did not initially, specifically, tell Mr. Encinias the reason he had pulled him over.  It was approximately 11 minutes after he pulled over the SUV, before Officer Ramos informed Mr. Encinias that he had been following another vehicle too closely.  It was at this time, after he had checked out the vehicle tags and identification number and the driver's license of Mr. Encinias, that Officer Ramos discussed the traffic violation of following too closely with him.  Upon discussing the topic of following too closely, Mr. Encinias stated that he understood that the white car was in front of him, but that he did not think he was *that* close to it.  Officer Ramos discussed with Mr. Encinias the importance of following a car by at least two lengths when traveling at highway speeds.  When discussing issuance of a citation for this traffic violation, Mr. Encinias indicated that he would prefer to pay a penalty assessment, as opposed to appearing in court to contest the citation.  Mr. Encinias checked the penalty assessment box on the traffic citation form, which stated:  "I acknowledge my guilt of the offense charged and my options as explained to me by the officer.  I agree to remit by mail the penalty assessment of $54.00."  He then signed the bottom of the form which stated:  "I acknowledge receipt of this notice and agree that a violation of the law has been committed.  No further action is required."  Officer Ramos gave Mr. Encinias a copy of the citation and returned all of his documentation to him.

As soon as these items were returned to him, Officer Ramos asked Mr. Encinas for consent to continue to speak to him.  Specifically, Officer Ramos told Mr. Encinias that he was free to leave, but immediately said, "but I do have a couple more questions if that's okay."  Mr Encinias responded, "Sure, that's fine."  Mr. Encinias did not walk away but continued to stay near Officer Ramos, no force or restraint was used by Officer Ramos on Mr. Encinias,  his weapon was not drawn, and he did not physically touch Mr. Encinias.  Officer Ramos did not command Mr. Encinias

to do anything, but used a casual and conversational tone of voice.  Officer Ramos asked Mr. Encinias for consent to search the vehicle, which Mr. Encinias granted.  Mr. Encinias signed the written consent-to-search form, which was written in English.

The passenger, Mr. Zamora-Perez, verbally granted consent at the vehicle and then gave written consent when he was standing at the right-of-way fence.  His consent was given subsequent to that of Mr. Encinias.  Officer Ramos is a Spanish speaker and discussed the consent form with Defendant Zamora-Perez in Spanish.  At the time that Mr. Zamora-Perez signed the consent form, he was not physically restrained in any way, and Officer Ramos's gun was not unholstered, nor did he threaten Mr. Zamora-Perez in any way.

Officer Ramos next opened the rear hatch of the SUV, which he considered unusually heavy. He removed some plastic molding from the vehicle, and discovered drugs in the hatch door of the vehicle.  Both defendants were 30-40 feet from the officer, observing his actions.  Neither defendant was restrained, nor did they attempt to narrow or withdraw the consent they had given, or object to the officer's actions. Once the drugs were discovered, Officer Ramos drew his weapon, both defendants were place in handcuffs, and arrested.

The Court finds that the testimony given at the hearing is inconclusive as to whether or not Defendants' separate stories about the purpose for their trip, and whom they intended to visit, were conflicting.  Although Officer Ramos testified that there were several inconsistencies  in the stories of the two defendants, he was unable to specifically explain what these inconsistencies were.  It is not inherently inconsistent to conclude that the two defendants were traveling to the same city to visit different persons.  The statements of Mr. Encinias that he was visiting his cousin and his aunt are not necessarily inconsistent.  The Court affords this testimony no weight.

Furthermore, the Court notes that there was a conflict in the testimony of Officer Ramos and

8

that of Mr. Zamora-Perez, insofar as whether or not Officer Ramos returned an identification card to Mr. Zamora-Perez, after he had written down information contained on the card.  None of this exchange with Mr. Zamora-Perez was captured by the audio/video camera. In light of the legal analysis that follows, the Court finds it unnecessary to resolve this conflict in the testimony on this issue, and further finds that none of the facts pertaining to the detention of Mr. Zamora-Perez is relevant to the ensuing analysis.

The Court also notes that there was a conflict in the testimony as to the position of the police vehicle, relative to that of the SUV, immediately prior to the time that Officer Ramos pulled behind Defendants' vehicle, and engaged the emergency lights, which then activated the operation of the video camera.  It is unnecessary to resolve this conflict in testimony, however, because it is non-probative.  Even if the Court were to believe Defendants' version of where the white car was, prior to the traffic stop, this version does not conflict with the testimony from the officers that Defendant Encinias was following "the white car" too closely.  The fact that "the white car" does not appear in the police video tape does not mean that it was not involved.  In fact, Defendant Encinias acknowledged seeing a "white car" in front of him.

### C.  Testimony of Martin Encinias[1]

According to Mr. Encinias, when he was pulled over, he was driving the speed limit. On cross-examination, Mr. Encinias admitted, by signing the citation form, that he would be considered guilty of the traffic violation.  He indicated that Officer Ramos did not force him in any way, and

---

[1]  Although Defendant Zamora-Perez also testified, the Court concludes that none of his testimony is relevant to the issues contained in the Court's analysis.  Accordingly, the Court makes no factual findings derived strictly from his testimony.

that the officer was always polite and courteous to him, and was not aggressive.  He stated that

Officer Ramos returned all of his documents to him after the citation was issued.  When Officer

Ramos told him he was free to go, Mr. Encinias did not feel free to go, although he provided no

objective reason as to why he would not have been free to go, once his documentation was returned

to him by Officer Ramos.

When asked about his consent to search, Mr. Encinias testified  that, although he did not

think he had a choice about whether or not to give consent to search the vehicle, he had no problem

with the search, because he had nothing to hide.  At the time he consented to the search, he was not

under arrest, he was not in handcuffs, and neither of the officers had a gun showing. Under the

totality of the circumstances, this consent was knowingly and voluntarily given without duress or

coercion, and it occurred during a consensual encounter.


## IV. Legality of Initial Traffic Stop

Both police officers testified that they observed the SUV  following too closely behind a

white car on Interstate 40.  The Court finds the testimony of the two officers to be credible, to the

effect that they observed the  SUV driving less than one car length behind the white car.  Mr.

Encinias testified that when he was pulled over, he was driving the speed limit, which was 75 miles

per hour, according to earlier testimony.  The arresting officer was aware of these two specific

articulable facts –  high speeds and dangerously close traveling distance –  which warranted his

suspicion that Mr. Encinias was violating the traffic laws of the state of New Mexico.

The language in the New Mexico statute is exactly the same as the Kansas statute in *United

States v. Vercher*, 358 F.3d 1257 (10th Cir. 2004).  In that case, a traffic stop for following too

closely at highway speeds involved a vehicle that was approximately two car lengths behind another

vehicle.  The Tenth Circuit concluded that "[o]n a rural interstate in Kansas, an officer's observation of the *high speed and dangerously close traveling distance* provides sufficient objective justification to suspect that the distance between the vehicles is not "reasonable and prudent." *Id.* at 1262 (emphasis added).  That Court concluded that, although these two observations may not necessarily be sufficient to convict, they are sufficient to provide a reasonable suspicion to effectuate a traffic stop. *Id.* at 1263.

The facts in this case involve vehicles traveling at highway speeds and an even shorter distance, less than one car length, between the SUV and the white car.  These two factors, observed by both officers,  provided a reasonable suspicion that the violation of following too closely had been committed.  Consequently, the traffic stop was reasonable at its inception.

In their supplemental brief, Defendants cite this Court to the case of *United States v. Gregory*, 79 F.3d 973 (10th Cir. 1996), wherein the Tenth Circuit held that a single incident of a vehicle crossing into the right emergency lane if an interstate highway did not violate the Utah traffic statute at issue, and that the traffic stop of the vehicle, based on purported suspicion that defendant was impaired by lack alcohol or lack of sleep, did not meet the reasonable test of the Fourth Amendment.  *Gregory* is distinguishable, in that its conclusion that an isolated incident of a vehicle crossing into the emergency lane does not violate Utah law was based upon an interpretation of Utah law that had been followed by the Utah Courts.  *Id.* at 978.  In contrast, the New Mexico statute in this case, N.M.S.A. § 66-7-318A, has not been interpreted to mean that one incident of following too closely does not constitute a violation of New Mexico law.

Furthermore, in the *Gregory* case, the alternative premise relied upon by the lower court to justify the stop of defendant's vehicle was not supported by the testimony of the arresting officer. While the traffic stop was ostensibly for the purpose of investigating whether the defendant was

impaired by alcohol or lack of sleep, the officer testified that he did not intend to stop the defendant to conduct a DUI investigation, and in fact, he did not administer a road sobriety test. The officer did not testify to any factors which would support a reasonable suspicion that the defendant's driving constituted a threat of injury to himself or others. He did not testify that he observed the defendant nod his head, or show any signs of sleepiness.

In contrast, the facts before the Court in this case indicate that one incident of following too closely is sufficient to constitute a violation of New Mexico law; that this infraction is what both officers in the police vehicle observed; that the intent of Officer Ramos was to cite the driver for this infraction, and that he did indeed issue a citation.

Having considered the events that occurred leading up to the stop, the Court concludes that, viewed from the standpoint of an objective reasonable police officer, these events amount to reasonable suspicion that Defendant Encinias was violating NMSA § 66-7-318A, which constitutes a valid reason to effectuate a traffic stop. Officer Ramos had sufficient grounds to stop the SUV. The totality of the circumstances indicate that the reasonableness test of the Fourth Amendment has been met and that the original traffic stop did not violate the Fourth Amendment.


**V.  Duration of the Traffic Stop; Conversion into Consensual Encounter**

Having determined that the officer's action was justified at its inception, the Court must now determine whether the investigative detention was reasonably related in scope to the circumstances that justified the interference in the first place. *Botero-Ospina*, 71 F.3d at 786. This detention may last only as long as necessary to effectuate the purpose of the stop. In this case, it was approximately 16 minutes between the initial stop and when Officer Ramos returned Mr. Encinias's documents to him and told him that he was free to go. During this time span, Officer Ramos

12

questioned the driver and passenger, communicated with a police dispatcher, who confirmed that Mr. Encinias was legally driving the vehicle and that it was not a stolen vehicle, and explained and issued a citation to Mr. Encinias.  Although it would have been preferable for Officer Ramos to immediately tell Defendant Encinias the reason for the traffic stop, his 11 minute delay in doing so is not in itself a factor that compels the conclusion that the investigative detention was overly long. The Court concludes that the length of time between  when Mr. Encinias was pulled over, and when Officer Ramos told him that he was free to go was reasonable, that the scope of the detention was related to the purpose of the stop, and that the purpose of the stop was effectuated during the period of investigative detention.  The investigative detention was reasonably related in scope to the circumstances that justified the traffic stop in the first place.  The detention of Defendant Encinias, while Officer Ramos verified his authority to operate the vehicle, was not extended beyond its original scope.

A stop generally ends when the officer returns the driver's documents to him, at which point questioning must cease and the driver must be free to go.  *Werking*, 915 F.2d at 1408.  An exception to this general rule is if the detention becomes a "consensual encounter." *Hunnicutt*, 135 F.3d at 1349.  In this case, Officer Ramos returned documents to Mr. Encinias, told him he was free to leave, and then immediately stated, "but I do have a couple more questions if that's okay."  Mr. Encinias quickly responded, "Okay, no problem."

In determining whether Mr. Encinias voluntarily consented to further questioning, and whether the continued encounter was indeed consensual, the Court must consider the totality of the circumstances, and determine whether a reasonable person would have believed that he was free to leave or disregard the officer's request for information.

The Court notes that Mr. Encinias did not walk away from Officer Ramos, that no force or

13

restraint was used, that no weapon was drawn, and that Officer Ramos did not physically touch Mr. Encinias. The voice of Officer Ramos on the tape was not authoritative at this juncture, but was casual and conversational in tone. There is nothing before the Court to suggest that the conduct of Officer Ramos would have communicated to a reasonable person that the person was not free to decline the officer's request or otherwise terminate the encounter. *See United States v. Elliot*, 107 F.3d 810, 813-14 (10th Cir. 1997)(court must focus on the totality of the circumstances in a particular case to determine whether a driver and police officer are engaged in a consensual encounter). Mr. Encinias did not provide a factual basis, via his testimony or otherwise, to support the conclusion that he had an objective reason to believe that he was not free to end the conversation with the officer and proceed on his way. At this juncture, the Court concludes that a reasonable person would have believed that he was free to leave, or to disregard the officer's request for further information. Under the totality of the circumstances, the Court concludes that the continued encounter between Officer Ramos and Mr. Encinias was consensual -- that it was a situation where Mr. Encinias voluntarily cooperated in response to non-coercive questioning by a law enforcement officer.

## VI.  Consent by Mr. Encinias to Search the Vehicle

During the consensual encounter that ensued, following the return of documents to Mr. Encinias, Officer Ramos quickly asked Mr. Encinias for consent to search the vehicle. As the driver of the vehicle, Mr. Encinias had standing to grant such consent. Mr. Encinias signed the written consent-to-search form. He has not challenged the voluntariness or validity of his consent and in fact, at the hearing he testified that he had no problem with the search, because he had nothing to

hide.  The Court concludes, based upon the record before it, including the factors mentioned above[2], that the consent of Mr. Encinias was voluntarily and knowingly given, that it was not coerced in any way, and that it was valid under the Fourth Amendment.

## VII.  Issues that Involve the Passenger, Mr. Zamora-Perez

The law is well settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  A seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  The Supreme Court recently clarified that a passenger is also seized during a traffic stop.  *Brendlin v. California*, 127 S. Ct. 2400, 2406 (2007).   Clearly a passenger has standing to object to constitutional violations such as the stopping of the car, the length of his/her detention thereafter, or the passenger's removal from the car.  *Id*. at 2408.  In challenging the lawfulness of his own detention, a passenger-defendant, who has neither a possessory nor ownership interest in a vehicle, although he may be unable to challenge the legality of the actual search[3], may nevertheless seek to suppress evidence found in the vehicle as the fruit of his own illegal detention.  *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir.

---

[2]  These factors were still present at the time that Mr. Encinias gave his consent for the search of the vehicle, to wit:  the fact that Mr. Encinias did not walk away from Officer Ramos, that no force or restraint was used, that no weapon was drawn, and that Officer Ramos did not physically touch Mr. Encinias nor talk to him in an authoritative manner.

[3]  It is well established that a passenger who asserts neither a possessory nor a property interest in a vehicle "would not normally have a legitimate expectation of privacy" in the vehicle protected by the Fourth Amendment. *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978).  The Tenth Circuit has applied *Rakas* to conclude that such passengers lack standing to challenge vehicle searches.  *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (1995).

2001).

At the hearing and otherwise, Mr. Zamora-Perez argued that he did not freely consent to the search of the vehicle, that he never felt he had any choice except to sign the consent-to-search form, and that if he had not signed it, the officers would have searched the car anyway.  Unlike other aspects of the traffic stop, prior to the actual search, because he asserts no possessory nor property interest in it, Mr. Zamora-Perez has no standing to challenge the search of the vehicle.

The fact that Mr. Zamora-Perez lacks standing to directly challenge the vehicle search does not mean, however, that he lacks standing to seek suppression of evidence discovered in a vehicle as the fruit of an unlawful stop, detention, or arrest.  *Eylicio-Montoya*, 70 F.3d at 1162.

Insofar as the original traffic stop is concerned, the Court has already concluded that the initial stop was valid, and that it did not violate the Fourth Amendment. In so doing, it has considered the arguments of both defendants, and finds no reason to alter this conclusion on behalf of Mr. Zamora-Perez.

To successfully challenge admission of evidence as being the fruit of an unlawful detention, Mr. Zamora-Perez must make two showings:  (1) "that the detention did violate his Fourth Amendment rights"; and (2) that there is "a factual nexus between the illegality and the challenged evidence." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000).  What this means is that generally, assuming he can establish that his detention was unconstitutional, any evidence obtained as a result of such an unlawful detention must be excluded as being the fruit of the poisonous tree. *United States v. Santana-Garcia*, 264 F.3d 1188, 1191 (10th Cir. 2001).  Certainly, any evidence derived from an illegal detention, such as through illegal questioning of him during an illegal detention, would necessarily be suppressed as being impermissibly tainted in Fourth Amendment terms. *See Elliott*, 107 F.3d at 813.

16

Under the facts of this case, there is no nexus between Mr. Zamora-Perez's detention and the challenged evidence. No evidence was obtained as a result of his detention, but rather was gained through the consent-to-search granted by the driver, Mr. Encinias, during his consensual encounter with Officer Ramos. Accordingly, Mr. Zamora-Perez cannot successfully challenge the admission of the evidence as being the fruit of his unlawful detention. Mr. Zamora-Perez simply has not established a factual nexus between his unlawful detention and the discovery of the methamphetamine.

In order to show a factual nexus, "[a]t a minimum, [Mr. Zamora-Perez] must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the Government's unconstitutional conduct." *Nava-Ramirez*, 210 F.3d at 1131 (*footnote and citation omitted*). Mr. Zamora-Perez has not met this "but-for" test. To do so, Mr. Zamora-Perez must show that the methamphetamine would never have been found but for *his*, and only his, unlawful detention. *DeLuca*, 269 F.3d at 1133.

## VIII.  CONCLUSION

Because the initial traffic stop, the investigative detention and the search challenged by Defendants in this case met the applicable constitutional requirements, the exclusionary rule does not provide any basis for suppressing any evidence that was produced as a result of those activities.

**WHEREFORE, IT IS HEREBY ORDERED**, for the reasons stated herein, that Defendants' Joint Motion to Suppress (Docket No. 45) shall be **denied.**

**IT IS SO ORDERED.**

**SENIOR UNITED STATES DISTRICT JUDGE**

18